IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ARTURO CARREON                    :

VS.                               :        CIVIL ACTION NO. B-03-234

                                  :

BROWNSVILLE MEDICAL CENTER        :
AND TENET HEALTHCARE, LTD.        :        (JURY REQUESTED)

---

## AFFIDAVIT OF EUGENE O'BRIEN M.D.

---

STATE OF TEXAS

COUNTY OF BEXAR

BEFORE ME, the undersigned Notary Public in and for the State of Texas, on this day personally appeared Eugene T. O'Brien, M.D., known to me to be the person whose name is subscribed hereto, who being first duly sworn in the manner provided by law, on oath stated as follows:

I am an orthopedic surgeon licensed by the Texas State Board of Medical Examiners. My license number to practice is D6834. I obtained my medical degree from the University of Minnesota in Minneapolis Minnesota in 1958. I performed my internship at Harbor General Hospital in Torrance California from 1958 through 1959. I successfully completed an Orthopaedic Surgery Residency at Northwestern University Medical Center in Chicago Illinois from

Page -1-

1961 through 1966.  I became board certified by the American Board of Orthopaedic Surgery in 1968.   I thereafter obtained a certification of added qualification in Hand Surgery in July 1992.

I practiced in the Air Force and held the following positions and assignments:  From July 1959 through June 1961, General Medical Officer and Flight Surgeon, Dobbins Air Force Base, Georgia; July 1966 through June 1968, Chief of Orthopaedic Surgery Service, Wright-Patterson United States Air Forced Medical Center, Dayton Ohio; July 1968 through September 1975, Chief of Hand Surgery Service, and subsequently Chief of Orthopaedics, Wilford Hall, United States Air Force Medical Center, Lackland Air Force Base, San Antonio, Texas.

I am a Clinical Professor of Orthopedic Surgery at the University of Texas Health Science Center (UTHSC) at San Antonio, Texas.  Through July 2004, I taught Orthopaedic surgery residents and hand fellows at UTHSC, The Hand Center, and Wilford Hall USAF Medical Center.  I currently teach hand fellows hand surgery at the Hand Center and I currently provide Orthopaedic consultation at Wilford Hall Medical Center.  I have published more than twenty peer reviewed journal articles on Orthopaedics and have given more than thirty presentations on different Orthopedic issues.

I am familiar with the type of ankle fracture made the basis of the lawsuit against the hospital in this case.  My familiarity

Page -2-

is based upon my knowledge, training, and clinical experience.  I have been retained by the attorney for the hospital to review the treatment rendered to Mr. Arturo Carreon by the Brownsville Medical Center (BMC) and its staff.  The attorney for the hospital requested that I evaluate two basic issues.  The first issue is whether BMC and its staff provided appropriate medical screening examinations to Mr. Carreon to determine if a emergency medical condition existed.  The second issue is whether BMC and its staff appropriately stabilized Mr. Carreon on his first and second visits to the BMC Emergency Room.

I have been advised that an emergency medical condition is defined as a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the health of the individual in serious jeopardy or serious impairment to bodily function or serious dysfunction of any bodily organ or part.  I have been advised that the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition exists.

I have been advised that when any individual comes to a hospital and the hospital determines that the individual has an

Page -3-

emergency medical condition the hospital and its staff must provide within the staff and facilities available at the hospital for such further medical examination and such treatment as may be required to stabilize the medical condition.  I have been advised that to stabilize means, with respect to an emergency condition, to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result with respect to an emergency medical condition.

Mr. Carreon was a 21 year old man who presented to the BMC Emergency Room at 02:55 hrs. on 12/7/01 after a fall in which he injured his right ankle.  He stated that he stepped wrong, fell down and injured the ankle.  He admitted to drinking "two beers" prior to the fall.  Mr. Carreon was promptly evaluated by Dr. Ivan Melendez, the ER physician.  The doctor noted edema and tenderness about the ankle with pain elicited on attempted inversion and eversion.  Pulses in the foot and sensation was documented as normal.  X-rays were obtained which showed a minimally displaced bimalleolar (lateral and medial malleoli) fracture of the right ankle.

Mr. Carreon was advised of his condition and a posterior plaster splint was applied to the leg and ankle.  He was given crutches and instructed in non-weight bearing ambulation.  He was

told to apply ice and elevate his ankle. He was given a prescription for Naprosyn 500 mg. every 12 hours for 7 days. (He refused an IM injection of Toradol for pain). Mr. Carreon was advised to see a bone specialist in the afternoon. He is noted as having been discharged in stable condition at 5:20 a.m.

Mr. Carreon returned to the BMC Emergency Room on 12/14/01, a week after the initial injury. He was evaluated by Dr. Timothy Rogler-Brown. He was complaining of severe pulsating pain in the ankle. Per the documentation in the chart he was supposed to have seen Dr. Bossolo, a bone specialist, that day but was not seen so he came to the ER. His toes were noted to be slightly cyanotic cold and had poor capillary refill (>3 seconds).

The splint and dressing were released. Bruising and swelling were noted in the foot and leg. Following the release the pain was relieved and the circulation improved so capillary refill was <2 seconds and there was no parathesis and sensation was intact. He was also given an imtra-muscular injection of Demerol and a prescription for Ibuprofen 400 milligrams BID (twice a day). A new splint was applied. New x-rays were obtained and again documented the ankle fractures. Dr. Brown spoke with Dr. Olson who was to see the patient in 3 days. He was told to continue the elevation and ice and to return to the ER if problems developed.

Page -5-

In conclusion, after reviewing the well documented ER records, regarding issue No. 1, it is my opinion that Mr. Carreon was provided an expeditious and completely appropriate medical screening exam. His ankle fracture was properly diagnosed and the presence of swelling, tenderness and normal circulation and sensation was noted. The first admission would qualify as an emergency condition because the patient has a closed fracture of both sides of the ankle and the joint is partially subluxed. On 12/14/01 the patient had an emergency medical condition when he presented to the Emergency Department at Brownsville Medical Center. He was having a circulation problem and was appropriately evaluated and treated by releasing and removing the splint and by applying a new splint.

Regarding issue No. 2, I believe that the BMC staff appropriately stabilized and treated Mr. Carreon's injury both during his first and second ER visits. His appropriate treatment included a splint and crutches, non-weight bearing ambulation instruction, and a prescription for pain medication was given. He was told to elevate his ankle and apply ice. He was told to contact a bone specialist the same day. Unfortunately Mr. Carreon did not or was not able to follow the ER doctors recommendation to seek orthopaedic care. He returned to the BMC ER on 12/14/01, a week after injury, with severe pain and cold, partially cyanotic

toes. His pain was relieved and the circulation returned to the toes following removal of the splint. The ankle was seen to still be swollen and bruised what is what would be expected. He was given a new splint, Demerol 75 intramuscular and a prescription for oral pain med. He was advised to keep his leg elevated and to apply ice. The ER doctor referred Mr. Carreon to Dr. Olson, an orthopedist (Dr. Rogler-Brown confirmed the referral over the phone). It was appropriate for Dr. Rogler-Brown to advise him to follow up with an Orthopaedic. Mr. Carreon received proper emergency evaluation and treatment for a closed fracture of the ankle. That consisted of examination, X-rays, application of a splint and instruction in elevation and crutch walking. Closed ankle fractures are appropriately treated by immobilization and splint with referral for orthopaedic follow up care. Based on reasonable medical probability with the measures taken there should not have been any material deterioration in his condition had he followed the ER doctors recommendation to seek follow up Orthopaedic care.

I do not know of anything else that could have been done, and wasn't, by BMC and its staff. His care and treatment certainly met the standard of care for this injury. The unfortunate delay in Mr.

Carreon's definitive orthopaedic care was in no way attributable to
BMC and its staff.



_____
Eugene T. O'Brien, M.D.

SWORN TO AND SUBSCRIBED before me, the undersigned authority,
by the said Eugene T. O'Brien, M.D. on October _19_TH_, 2004, to
certify which witness my hand and seal of office.

_____
Notary Public in and for
The State of Texas

My Commission Expires: _06-01-2007_

DENNIS M. PEAK
MY COMMISSION EXPIRES
June 1, 2007

[Notary Seal]