**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **ARTURO CARREON,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **NO. B-03-234** |
| | § | |
| **BROWNSVILLE MEDICAL CENTER AND** | § | |
| **TENET HEALTHCARE, LTD.** | § | |
| **Defendants.** | § | |

**OPINION AND ORDER**

BE IT REMEMBERED that on April 26, 2005, the Court **GRANTED** Defendants'
Motion for Summary Judgement [Dkt. No. 14].

**I. Introduction and Factual Background**

Plaintiff brings suit under the Emergency Medical Treatment and Active Labor Act
("EMTALA"), in which he alleges he did not receive proper emergency medical treatment
at Brownsville Medical Center ("BMC"). *See* 42 U.S.C. § 1395dd**.**

Arturo Carreon ("Plaintiff") was 21 years old when he arrived at BMC at
approximately 2:55 a.m. on December 7, 2001. Plaintiff had fallen and suffered an injury to
his right ankle. Dr. Ivan Melendez was the first Emergency Room ("ER") doctor to examine
Plaintiff. Dr. Melendez noted edema and tenderness around Plaintiff's ankle, and Plaintiff
was experiencing pain resulting from "attempted inversion and eversion." Def's Motion,
Ex. 1, at p. 4. X-rays were taken of Plaintiff's ankle, which revealed a "minimally displaced
bimalleolar (lateral and medial malleoli) fracture of [his] right ankle." *Id.* Doctors placed a
posterior plaster splint on Plaintiff's leg and ankle, gave Plaintiff crutches, and instructed
Plaintiff "in non-weight ambulation." *Id.* As part of his follow-up instructions, doctors
instructed Plaintiff to apply ice and elevate his ankle, and doctors gave Plaintiff a
prescription for 500 miligrams of Naprosyn to be taken every 12 hours for 7 days. Doctors

1

advised Plaintiff that he should see a bone specialist later the same day. Plaintiff was released from the ER at approximately 5:20 a.m. in stable condition.

On December 14, 2001, Plaintiff returned to the ER at BMC. Dr. Timothy Rogler-Brown evaluated Plaintiff, who complained of severe pulsating pain in his ankle. Plaintiff's "toes were noted to be slightly cyanotic cold and had poor capillary refill (>3 seconds)." *Id.*, Ex. 1, at p. 5. The removal of Plaintiff's splint and dressing revealed bruising and swelling in Plaintiff's foot and leg. Upon removal of the splint, Plaintiff's pain was relieved, his circulation improved and capillary refill was <2 seconds with no parathesis and sensation was intact. *Id.* Plaintiff was given an inter-muscular injection of Demerol and a prescription for 400 milligrams of Ibuprofen to be taken twice per day. New x-rays were taken, which revealed that Plaintiff's ankle was fractured. A new splint was applied.

According to the affidavit of Dr. Eugene O'Brien, an orthopedic surgeon, documentation in Plaintiff's hospital chart indicated he was scheduled to see Dr. Bossolo, a bone specialist on December 14, the same day he arrived at the ER for a second visit.[1] In fact, Dr. Rogler-Brown spoke with Dr. Bossolo, the orthopedic doctor who was to scheduled to see Plaintiff three days after his discharge from the ER. Dr. O'Brien's affidavit notes that based on Plaintiff's hospital chart, Dr. Bossolo did not ultimately see Plaintiff on the scheduled day. Prior to discharge the second time, BMC staff again instructed Plaintiff to keep his ankle elevated, continue to apply ice, and return to the ER if he developed problems.

Plaintiff's mother, Yolanda Aleman, testified through deposition that between Plaintiff's two visits to the ER, she did not take her son to see a doctor for follow-up care as instructed by Dr. Rogler-Brown. She states that because Plaintiff's pain was never relieved after the first visit to the ER, she took him back to the ER because she did not have insurance to take her son to another doctor. Plaintiff's mother recalled that during Plaintiff's first visit to the ER, Dr. Rogler-Brown spoke with Dr. Olson, an orthopedist, and

---

[1]Defendant does not submit the actual hospital records. Instead, Defendant presents the Court with Dr. O'Brien's affidavit and the deposition testimony of Plaintiff's mother.

arranged for a follow-up appointment days later.  Moreover, Plaintiff's mother signed discharge instructions in which Plaintiff was instructed to see Dr. Olson for a follow-up visit. Ms. Aleman stated she did not bring her son for follow-up care to the orthopedist after the December 14 ER visit because she did not have insurance.  In fact, Ms. Aleman concedes in her deposition that she did not take her son for follow-up care until January 16, 2002, when they visited the Santa Maria Clinic in Brownsville, Texas.  Notes from the January 16 doctor's appointment, referenced during Ms. Aleman's deposition, indicated that Plaintiff was seen at BMC, splinted and told to see an orthopedic doctor "ASAP but no money."  At the January 16 appointment, the clinic referred Plaintiff to Dr. Achleitner on January 25. Plaintiff saw Dr. Achleitner on January 25 and again on February 20, 2002.  On Plaintiff's second visit to Dr. Achleitner, the doctor recommended surgery.  Dr. Achleitner never performed the surgery and Ms. Aleman understood this was the case because her Medicaid had expired.  Finally, Ms. Aleman stated she did not bring her son to visit Dr. Achleitner again because her son did not have insurance and she believed the doctor would not see her son without insurance.

## II.  Standard for Summary Judgment

Plaintiff has not filed a response to Defendants' Motion for Summary Judgment. Local Rule 7.4 states that failure to respond to such a motion is interpreted as a representation of no opposition.  Nevertheless, a Court cannot grant summary judgment simply because there has been no opposition to the motion.  *Hibernia Nat'l Bank v. Admin. Cental Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985) (citation omitted).  Stated differently, the Court may not issue a default summary judgment.  The Court may, however, accept as undisputed the movant's version of the facts and grant summary judgment where the movant has met his initial burden of making a prima facie showing of his entitlement to summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986).  If the movant fails to meet his initial burden, the nonmovant is not required to respond to the motion.  *See John v. State of Louisiana (Board of Trustees for State Colleges and Universities)*, 757

F.2d 698, 708 (5ᵗʰ Cir. 1985).  But, once a movant meets his initial burden, the nonmovant is not permitted to rest on the "mere allegations of his pleadings."  *Isquith for and on Behalf of Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186, 199 (5ᵗʰ Cir. 1988).

Summary judgment shall be granted if the record, taken as a whole, "together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Factual controversies, if any exist, are resolved in favor of the nonmoving party.  *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5ᵗʰ Cir. 1994) (en banc).  *See also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).  The party making a summary judgment motion has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery documents that demonstrate the absence of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case").  *See also Colson v. Grohman,* 174 F.3d 498, 506 (5th Cir.1999).  Although the party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact," *Celotex Corp.*, 477 U.S. at  323, the party "need not negate the elements of the nonmovant's case." *Little*, 37 F.3d at 1075 (citing *Celotex,* 477 U.S. at 323).

If the moving party meets this burden, the non-movant then must designate specific facts, beyond the pleadings, showing there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Little*, 37 F.3d at 1071 (citing *Celotex*, 477 U.S. at 325).  "Unsubstantiated assertions" or "mere allegations or denials" will not adequately cast doubt on material facts at issue.  *See id.* (citing *Hopper v. Frank*, 16 F.3d 92 (5ᵗʰ Cir. 1994); *see also* Fed. R. Civ. P. 56(e).  Likewise, the nonmovant must present more than a mere "scintilla" of evidence.  *See Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5ᵗʰ Cir. 1994).  The evidence must be viewed in the light most favorable to the nonmovant.  *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 228 (5th Cir. 2003); *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir.

4

2000).  Summary Judgment should be granted "when the nonmoving party fails to meet its burden to come forward with facts and law demonstrating a basis for recovery that would support a jury verdict."  *Little*, 37 F.3d at 1071.

## III.  Legal Standard EMTALA Claims

EMTALA creates a cause of action for individuals who suffer harm as a result of a hospital's failure either to administer a proper medical screening examination, 42 U.S.C. § 1395dd(a), or to stabilize an individual with a statutorily defined emergency medical condition before transfer, *id.* § 1395dd(b).

EMTALA provides in relevant part:

> In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency condition exists . . .

42 U.S.C. § 1395dd(a).  An appropriate medical screening examination, as referenced in EMTALA, is not defined.  Most courts, however, interpret "appropriate medical screening" as a screening the hospital would have offered to any other patient in a similar condition with similar symptoms.  *See Summers*, 91 F.3d at 1138 ("An inappropriate screening examination is one that has a disparate impact on the plaintiff."); *see also Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1ˢᵗ Cir. 1995) ("The essence of this requirement is that there be some screening procedure and that it be administered even-handedly.").

An "emergency medical condition" is defined in relevant part as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in –
> (i) placing the health of the individual . . . in serious jeopardy,
> (ii) serious impairment to bodily functions, or
> (iii) serious dysfunction of any bodily organ or part . . . .

*Id.* 1395dd(e)(1).  If the hospital determines the individual has an "emergency medical

condition,"

> The hospital must provide either –
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
> (B) for transfer of the individual to another medical facility . . . .

*Id.* 1395dd(b)(1).

Stabilizing a condition, as that term is defined in EMTALA, requires the hospital "to provide such medical treatment . . . as may be necessary to assure, with reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A).  *See also Burditt v. United States Dep't of Health & Human Servs.*, 934 F.2d 1362, 1369 (5th Cir. 1991) (defining "to stabilize" as "[t]reatment that medical experts agree would prevent the threatening and severe consequence of" the patients emergency medical condition while in transit.).  "Transfer" is defined in EMTALA to include a discharge home.  *Id.* § 1395dd(e)(4).

The Fifth Circuit, along with others, has held that Congress did not intend EMTALA to be used as a federal malpractice statute, but instead was passed to prevent "patient dumping," –that is, the practice of refusing to treat patients who are unable to pay for hospital services.  *See Marshall v. East Carroll Parish Hospital Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998) (citations to case law in other circuits omitted).  Additionally, under EMTALA, an "appropriate medical screening examination" does not mean the hospital or doctors proficiently and accurately diagnosed the patient's condition or illness.  Instead, the question is whether the hospital performed equitable screening in comparison to the care rendered to other patients with similar symptoms.  *See id.* (citing *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1138 (8th Cir. 1996) (en banc).  Thus, even if the physician examining the patient made a misdiagnosis that could subject him to liability in a medical malpractice action under state law, the hospital is not liable under EMTALA if it provided an appropriate medical screening examination.  *See, e.g., Marshall*, 134 F.3d at

322 (citing *Eberhardt v. City of Los Angelos*, 62 F.3d 1253, 1258 (9th Cir. 1995) (holding "[t]he hospital's failure to detect the decedent's alleged suicidal tendency may be actionable under state medical malpractice law, but not under the EMTALA."); *Barber v. Hosp. Corp. of Am.*, 977 F.2d 872, 879-80 (4th Cir. 1992) ("Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery.").

### IV. Summary Judgment Analysis

In this case, Defendants present Dr. Eugene O'Brien's affidavit in which he concludes after reviewing Plaintiff's ER records that BMC provided an expeditious and completely appropriate medical screening exam on both ER visits. Moreover, Dr. O'Brien concludes BMC staff appropriately stabilized and treated Plaintiff's injury on both ER visits. Dr. O'Brien opines that Plaintiff's condition was in fact properly diagnosed. As the case law suggests, a proper diagnosis is not a necessary predicate to successfully defending suit under EMTALA. More relevant to the Court's analysis of Plaintiff's EMTALA claim, however, is Dr. O'Brien's conclusion that he "d[id] not know of anything else that could have been done, and wasn't, by BMC and its staff. [Plaintiff's] care and treatment certainly met the standard of care for his injury. The unfortunate delay in [Plaintiff's] definitive orthopedic care was in no way attributable to BMC and its staff." Def's Motion, Ex. 1, at p. 8.

In order to avoid summary judgment, Plaintiff must present evidence showing a material issue of fact as to whether BMC's screening procedures complied with EMTALA. Evidence demonstrating BMC deviated from its normal medical screening policy, and thus did not provide Plaintiff with an adequate medical screening examination equal to that received by other patients, may support a hospital's violation of EMTALA. *See Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519 (10th Cir. 1994) (cited in *Battle*, 228 F.3d at 558). For example, in *Marshall*, the Fifth Circuit found there was insufficient evidence of an EMTALA violation where the record contained no description or identification of other patients with similar symptoms who required treatment at the hospital and were provided such treatment

7

superior to that received by the Plaintiff. *Marshall*, 134 F.3d at 322.

Defendant presents evidence of proper diagnosis and the administration of the correct standard of care, which are not defenses to an EMTALA claim. More relevant, however, is Defendant's evidence that Dr. O'Brien knows of nothing else that could have been done to better screen or stabilize Plaintiff's injury. Plaintiff bears the burden of showing that the hospital treated him differently from other patients, particularly those that are paying patients. *See Battle v. Memorial Hosp. at Gulfport*, 228 F.3d 544, 557 (5th Cir. 2000) ("An appropriate medical screening examination is determined 'by whether it was performed equitably in comparison to other patients with similar symptoms,' not 'by its proficiency in accurately diagnosing the patient's illness.'"); *Marshall*, 134 F.3d at 323 (citing *Williams v. Birkeness*, 34 F.3d 695, 697 (8th Cir. 1994). In light of the evidence Defendants present, Plaintiff is required to respond to the Motion for Summary Judgment, instead of resting on allegations pleaded in his complaint.

Moreover, Defendants present adequate evidence that BMC properly stabilized Plaintiff on both visits to the ER before discharging him. Defendant's own evidence demonstrates Plaintiff suffered from a statutorily defined emergency medical condition, as his ankle fracture caused severe pain requiring immediate medical attention, without which could have caused serious dysfunction, serious impairment to bodily function, or placed his health in jeopardy. S*ee* 42 U.S.C. § 1395(e)(1)(A). BMC's duty to stablize Plaintiff only arose once the hospital first detected Plaintiff's emergency medical condition. *See Eberhardt*, 62 F.3d at 1259; *Urban By and Through Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994). In this case, as in *Phipps v. Bristol Regional Med. Ctr.*, BMC staff stabilized Plaintiff for what they believed would be a short time before Plaintiff saw an orthopedic surgeon for his fractured ankle. *See Phipps v. Bristol Med. Ctr.*, 117 F.3d 1421, at *2 (6th Cir. 1997) (unpublished opinion). This stabilization was accomplished by performing X-rays on Plaintiff's ankle, setting his ankle in a splint, and giving him follow-up instructions. Most importantly, BMC staff procured follow-up treatment for Plaintiff, in the form of a referral, before releasing him.

### V.  Conclusion

In conclusion, the record contains no evidence that BMC refused to provide Plaintiff with the necessary medical screening examination and stabilizing treatment because he was unable to pay.  If such evidence exists, Plaintiff's failure to respond is woefully inadequate at best.  Based on the record before it, the Court **GRANTS** Defendants' Motion for Summary Judgment [Dkt. No. 14].  As a result, the Court **CANCELS** the Final Pretrial Conference scheduled in this case for April 27, 2005.

DONE this 26th day of April, 2005, at Brownsville, Texas.

Hilda G. Tagle
United States District Judge